**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 16-cv-0761-WJM-MJW

MICHAEL OLIVERO and
ANGELA OLIVERO,

      Plaintiffs,

v.

TREK BICYCLE CORPORATION, a Wisconsin Company,

      Defendant.

---

## ORDER ON PENDING MOTIONS

---

This lawsuit arose from a bicycle accident that caused significant injuries to
Plaintiff Michael Olivero.  He and his wife, Plaintiff Angela Olivero (together, the
"Oliveros"),[1] sue Defendant Trek Bicycle Corporation ("Trek") on theories of product
liability, negligence, breach of warranty, and (as to Angela Olivero) loss of consortium.

Currently before the Court are four motions: (1) Trek's Motion for Summary
Judgment (ECF No. 33); (2) Trek's Motion *in Limine* to Preclude Evidence Related to
Certain Alleged Future Economic and Noneconomic Damages ("Motion *in Limine*")
(ECF No. 47); (3) the Oliveros' Motion to Strike Defendant's Rebuttal Accident
Reconstruction Expert ("Motion to Strike Rebuttal Expert") (ECF No. 68); and (4) the
Oliveros' Motion to Strike the Affidavits and New Evidence from Defendant's Summary
Judgment Reply Brief ("Motion to Strike Reply Evidence") (ECF No. 78).  For the
reasons discussed below, Trek's summary judgment motion is denied.  As for the

---

[1] Any reference in this order solely to "Olivero" refers to Michael Olivero.

various evidentiary motions, each is granted in part and denied in part, and, as to certain objections to expert testimony, both parties must elect whether to seek a rebuttal from an expert of their own, as explained below. Absent such an election, the Court will strike a portion of the expert opinions in question.

## I. UNDISPUTED FACTS

Trek designs, manufactures, and sells bicycles and their various components. (ECF No. 33 at 3, ¶ 1.) Sometime in 2014, Olivero purchased a Trek bicycle. (*Id.* ¶ 2.) On March 25, 2015, Olivero purchased a new Trek carbon fiber bicycle fork to replace the fork then installed on his bicycle. (*Id.* ¶ 5.) This new fork was not manufactured in a Trek facility, but was instead manufactured by a Chinese subcontractor named Martec Industrial Corp. ("Martec"). (ECF No. 49 at 7, ¶ 1.)

Olivero had his new fork professionally installed by the bike shop where he purchased the fork. (ECF No. 33 at 3, ¶ 6.) The bike shop performed the installation properly. (ECF No. 49 at 15, ¶ 1.) From that date (March 25, 2015) until the accident that led to this lawsuit, Olivero rode his bicycle with the replacement fork many times for a significant distance, in the aggregate. (ECF No. 33 at 4, ¶ 7; ECF No. 49 at 6–7.)

On June 15, 2015, Olivero was riding his bicycle on South Garrison Street in Lakewood, Colorado, when he "suddenly and unexpectedly crashed." (ECF No. 33 at 5, ¶¶ 15–16.) Olivero has no memory of the event. (*Id.* ¶ 17.) Two eyewitnesses saw it happen, however. (*Id.* at 6, ¶ 18.) These eyewitnesses were traveling in a car some distance behind Olivero, who was riding to the right of the automobile traffic lanes and also to the right of a designated bike lane. (*Id.* ¶¶ 19–22.) Both eyewitnesses testified to seeing essentially the same event: the bicycle fork snapped in a backwards direction

for no discernible reason, the bicycle collapsed beneath Olivero, and he fell forward over his handlebars and onto the pavement. (ECF No. 49 at 16, ¶¶ 4–10.) The right side of his face struck the pavement just before, or about the same time as, the rest of his body.

Again, Olivero does not remember the accident. Based on his normal riding behavior, however, he estimates that he was likely traveling 15–20 mph at the time. (*Id.* at 17, ¶ 12.) Post-accident investigation revealed no skidmarks or signs of a foreign object that might have lodged in Olivero's wheel. (*Id.* at 18, ¶ 17; *id.* at 21, ¶ 32.)

All of the bicycle components, including the broken fork, have been preserved as evidence for this lawsuit (ECF No. 33 at 7, ¶ 29), which Olivero filed on April 1, 2016 (ECF No. 1).

## II. THE OLIVEROS' MOTION TO STRIKE TREK'S EXPERT EVIDENCE

Before addressing the parties' substantive arguments for and against summary judgment, the Court must resolve a heated dispute over the proper extent of Trek's rebuttal expert's opinions.

## A.    The Competing Reports

The Oliveros retained Braden Kappius—who has significant education in metallurgy, materials science, and mechanical engineering—to inspect the broken bicycle and to provide an expert report. Kappius's report is dated November 11, 2016. (ECF No. 68-1 at 11.) The most important statements in the report are as follows:

> **Purpose:**
>
> The purpose of this analysis was to determine the most likely cause of the accident and whether or not manufacturing defects and/or improper installation and assembly of the fork onto the frame caused or contributed to the June 15, 2015 accident.

**<u>Procedure</u>:**

The bicycle components recovered following the accident were inspected . . . [in] the presence of representatives from the Trek Bicycle Corporation.

* * *

**<u>Bicycle Description</u>:**

. . . Mr. Olivero reports riding the bike under normal riding conditions without incident or impact damage until the date of the accident. . . .

* * *

**<u>Fork Description</u>:**

* * *

After the accident, the fork was fractured on both fork legs approximately 5 inches above the wheel dropout location . . . . The location of the failure is away from any moving parts of the wheel. There is no indication in the region of the failure that there was [a]n impact to the fork legs from a foreign object prior to or contributing to the failure.

* * *

**<u>Conclusions</u>:**

After analyzing the available evidence and through engineering analysis, we have reached the following conclusions with a reasonable degree of engineering certainty:

- There is no engineering evidence to suggest that improper assembly of Mr. Olivero's bicycle caused or contributed to the June 15, 2015 incident in which Mr. Olivero was injured.

- There is no indication of undue applied stresses to the bicycle from, but not limited to, crashing of the bicycle, use under unsuitable conditions which the bicycle was not designed for[,] or abnormal external forces.

- With the evidence available to date, all signs point toward spontaneous and catastrophic failure of the fork that can

only be attributed to underlying defects. While these
defects might not have made themselves present prior to
the accident, that does not preclude them from existing.
Carbon fiber composites can and will often fail in a
sudden and catastrophic manner. This is a function of
the mechanical properties of carbon fiber composites.

(*Id.* at 11–15 (typeface formatting in original).)

Trek designated a mechanical engineer, Gerald Bretting, as its rebuttal expert. Bretting's rebuttal report is dated January 6, 2017. (ECF No. 68-2 at 4.) The Bretting Report contains a substantially longer narrative of what he observed at the in-person inspection of Olivero's bicycle. (*Id.* at 5–7.) Among his observations were "an impact crack to the aft surface of the left fork blade between 3.5 and 3.75 inches below the crown race seat [*i.e.*, below where the fork inserts into the head tube] with scraping around in this area that leads to the inboard surface of the left fork blade"; that the front wheel has one broken spoke, but "[t]he direction of the overload that caused the spoke to break cannot be determined by the spoke alone"; and that "[t]he valve stem of the inner tube [of the front wheel] is bent from a load that is opposite the direction of rotation." (*Id.* at 5, 6.) Later in the report, it becomes clear that the broken spoke was immediately adjacent to the bent valve stem. (*Id.* at 7.)[2] Bretting also noted that the parts of the bicycle that normally sit closest to the ground, *i.e.*, the crank arms and the chain rings, showed "no signs of ground contact." (*Id.* at 6.)

As for his opinions, Bretting disputes Kappius's statement

that there is no indication of undue applied stresses to the
bicycle frame; to the contrary, there is abundant physical
evidence of stress being applied at the aft facing surface of

---

[2] In other words, if the bicycle was in forward motion and an observer was watching it from the side, the observer would see the valve stem pass through the fork and then the spoke that ultimately broke would pass through immediately afterward.

> the left fork blade, which then translated into force on the
> forks being applied by the rider pitching over the front as
> described below.

(*Id.* at 7, ¶ 1(a).)  This opinion foreshadows the bulk of Bretting's remaining opinions,

which largely comprise a description of how a foreign object must have been picked up

and carried by the valve stem or a spoke until it lodged against the aft surface of the

fork blade, which bent the valve stem and then lodged against the adjacent spoke,

causing the wheel to suddenly stop rotating, in turn causing Olivero and the rearward

portion of his bicycle to pitch forward around the axis created by the now-immobilized

front wheel.  That forward pitch caused an enormous amount of stress on the spoke and

the forks, causing both to break.  (*Id.* at 7–8, ¶¶ 2–5.)  But, says Bretting, Olivero would

have pitched forward and off his bike in any event (*i.e.*, even if the fork had not broken)

given the sudden stoppage of the front wheel.  (*Id.* ¶ 4.)  Bretting's reconstruction of this

scenario contains details at the millisecond level, *e.g.*, how long it would take for a

foreign object to be picked up and carried until it hit the back of the fork, how quickly the

fork would have snapped, etc.  (*Id.* ¶ 3.)

        Bretting also offered the following attacks on Kappius's opinions:

> The loads required to break a spoke of the front wheel were
> in the order of magnitude of 400 to 500 lbs.  A load of this
> magnitude is only created when the bicycle and rider are
> pitching over with an object wedged between the back of the
> fork and a spoke.
>
> The cracking on the under surface of the fork crown is
> further evidence of a large rearward load being applied to
> the fork blades.
>
> During normal riding the fork is in [*sic*] forward bending.  The
> load on the fork on a smooth road with a 160 lb rider with his
> hands on the brake hoods is between 72 and 144 lbs.  If the
> fork was to break under those circumstances, the front wheel
> would move forward away from the rest of the bicycle.  As

the front wheel moves away, the bicycle will drop toward the
ground with either the large chain ring or a crank arm
impacting the ground first followed by the upper fracture
surface of the fork blades.

The lack of physical evidence of ground contact to the chain
rings, crankarms, chain, and the upper fracture surfaces of
the fork blades is inconsistent with the fork failing during
normal riding loads.

(*Id.* at 8, ¶¶ 7–10.)

## B.    The Oliveros' Objections to Bretting's Report

### 1.    Failure to Submit the Report in the Form of an Affidavit or Declaration

Trek attached Bretting's expert report as-is to its summary judgment motion.  The

Oliveros, in their response brief, objected that Bretting's opinions are not competent

summary judgment evidence in that form, but must be in the form of an affidavit or

declaration.  (ECF No. 49 at 14.)  Trek, in its reply brief, attached an affidavit from

Bretting attesting that he would testify consistent with his expert report.  (ECF No. 63-2.)

He expressed no new opinions in that affidavit.  Unsatisfied, the Oliveros filed their

Motion to Strike Reply Evidence, opening with a gratuitous *ad hominem*: "It appears that

Trek simply cannot figure out how to procedurally pursue a summary judgment motion.

Further motion practice is therefore necessary."  (ECF No. 78 at 1.)  The Oliveros argue

that Bretting's reply affidavit is simply too late.  (*Id.* at 1–4.)

It is difficult to understand how such a petty and easily correctable issue could be

worthy of motion practice.  Unfortunately, the Oliveros' counsel have company—the

Court has recently faced this issue in multiple cases.  The resolution here is the same

as before:

The Court is frankly tired of addressing this utterly formalistic
and baseless (yet surprisingly common) objection.  *See
Pertile v. Gen. Motors, LLC*, 2017 WL 4237870, at *2 (D.

Colo. Sept. 22, 2017).  The cases [the Oliveros] cite[] in support of [their] position—*Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158 n.17 (1970), and *Sofford v. Schindler Elevator Corp.*, 954 F. Supp. 1459, 1462–63 (D. Colo. 1997)—have been abrogated on this point by the 2010 amendments to Federal Rule of Civil Procedure 56.  *See Pertile*, 2017 WL 4237870, at *2 & n.3.  The proper question at summary judgment is whether the proffering party "is incapable of presenting its experts' intended testimony 'in a form that would be admissible in evidence [at trial].'"  *Gunn v. Carter*, 2016 WL 7899902, at *2 (D. Colo. June 13, 2016) (quoting Fed. R. Civ. P. 56(c)(2)).  [The Oliveros] do[] not attempt to show that [Trek] cannot bring [Bretting] to testify at trial, or that [Bretting's] opinions have not been adequately disclosed.  [The Oliveros'] objection is therefore overruled.

*Sanchez v. Hartley*, 2017 WL 4838738, at *12 n.11 (D. Colo. Oct. 26, 2017).

2.    Improper Rebuttal Opinions

The Oliveros have a second attack on Bretting's report.  Trek disclosed Bretting as a rebuttal expert, but, according to Trek, Bretting's opinions go well beyond proper rebuttal.  (ECF No. 68.)

A proper rebuttal expert opinion is one offered "solely to contradict or rebut evidence on the same subject matter identified by another party" through that party's affirmative expert disclosures.  Fed. R. Civ. P. 26(a)(2)(D)(ii).  Understanding whether any of Bretting's opinions are proper rebuttal opinions requires keeping in mind the following three statements that Kappius made in his report:

- "There is no indication in the region of the failure that there was [a]n impact to the fork legs from a foreign object prior to or contributing to the failure."  (ECF No. 68-1 at 14.)

- "There is no indication of undue applied stresses to the bicycle from, but not limited to, . . . abnormal external forces."  (*Id.* at 15.)

- "With the evidence available to date, all signs point toward spontaneous

and catastrophic failure of the fork that can only be attributed to underlying defects." (*Id.*)

Given these statements, Bretting remained within the realm of proper rebuttal by offering contrary opinions, *i.e.*, that there *is* an indication in the region of the failure of an impact from a foreign object; that there *is* an indication of undue applied stresses from abnormal external forces; and that "all signs" do *not* point toward spontaneous failure that can only be attributed to underlying defects. Bretting was also entitled to explain why he believes these opinions are true, namely, why the evidence leads him to believe that a foreign object became lodged in the spokes and then against the back of the fork, causing a pitch-over event that led both to the fork breaking and Olivero tumbling over the handlebars.

The Oliveros argue that "[t]his fanciful defense theory could have never been foreseen by Plaintiffs as an alternative cause that had to be ruled out." (ECF No. 68 at 11.) They even go so far as to claim that Bretting's theory "was about as expected and fanciful as Mr. Olivero being somehow stricken by unseen lightning descending from the heavens!" (ECF No. 77 at 8.) This is simply not true. Kappius's report specifically describes whether he saw evidence of a foreign object, or of undue external forces, or of any potential cause aside from a latent defect. He says he did not. Bretting says he did. The jury will decide whose opinions are more plausible, but Kappius's report shows that a theory such as Bretting's was at least foreseeable. Accordingly, the Court finds that paragraphs 1–2 and 4–15 of Bretting's "Opinions" section (ECF No. 68-2 at 7–9) are proper rebuttal opinions that may be tested through cross-examination, as with all other admissible expert testimony.

Paragraph 3 of Bretting's "Opinions" section, however, requires a different result. This paragraph goes far beyond an opinion that the damage to the bike is consistent with a foreign object lodging in the spokes. It instead provides a millisecond-by-millisecond account of how Bretting believes the accident played out. It is, in other words, an affirmative accident reconstruction opinion. Its apparent primary purpose is to show how a fork failure caused by a foreign object could happen so quickly that it would be indistinguishable to most eyewitnesses from spontaneous failure—which is what the eyewitnesses here said that they saw. This is not offered solely to contradict or rebut Kappius's report, and should have been disclosed no later than the affirmative expert deadline, thus giving the Oliveros a chance to provide a rebuttal.

The question at this point is the proper remedy. The default remedy is exclusion, per Rule 37(c)(1). However, the Court will give the Oliveros a choice between exclusion or obtaining a rebuttal to Bretting's paragraph 3.[3] If the Oliveros choose to obtain a rebuttal report, the Court will set an appropriate deadline that accommodates the quickly approaching trial. The Oliveros' choice has no effect on the outcome of Trek's summary judgment arguments, as will become clear in Part IV, below.

### III. THE OLIVEROS' MOTION TO STRIKE REPLY EVIDENCE

Yet another evidentiary motion stands in the way of the Court's summary judgment analysis. The Oliveros have moved to strike an affidavit submitted with Trek's summary judgment reply brief. (ECF No. 78.) The context for this motion is as follows.

The Oliveros' response brief argues that a disputed issue of fact exists regarding

---

[3] A rebuttal to paragraph 3 would, almost by necessity, likely provide indirect rebuttal to other paragraphs in Bretting's report. This is appropriate, but—should the Oliveros elect to obtain a rebuttal report—the Oliveros are warned not to abuse this opportunity by offering theories that *they* should have affirmatively disclosed.

whether the fork was actually manufactured according to proper standards because, among other reasons, Trek wanted to obtain Martec's precise technical specifications for its carbon fiber fabrication process, but Martec balked due to trade secret concerns, and Trek backed off.  (ECF No. 49 at 22–23, ¶¶ 41–45.)  The implication, of course, is that Trek was not as careful as it claimed to be.  The Oliveros also argued from a blueprint of the fork containing a footnote stating, "Failure mode must be ductile [*i.e.*, bending without breaking] and within the aluminum parts.  Failure in the carbon legs is not permitted."  (*Id.* at 24–25, ¶¶ 51–53 (internal quotation marks omitted).)  The Oliveros compare this to the fact that the legs of the fork in question *did* fail, thus attempting to raise the inference that the fork did not conform to manufacturing specifications.  Finally, the Oliveros argued that Trek's evidence regarding Martec's testing of forks after their manufacture is inadmissible hearsay because, among other reasons, Trek had not shown that Martec was "under a business duty or compulsion to provide accurate information to qualify for the reliability and trustworthiness rationale of the [business records] exception [*i.e.*, Fed. R. Evid. 803(6)]."  (*Id.* at 11.)

To address all of these assertions, Trek submitted with its reply brief an affidavit of Stephen Moechnig, a Trek engineer who actually designed the model of fork that failed in this case.  (ECF No. 63-6.)  Moechnig explained that, once Trek decided not to press Martec on the trade secret issue, it chose instead to create a system by which every Martec fork would undergo load testing to ensure proper manufacturing.  (*Id.* ¶¶ 13–28.)  As for the blueprint describing the ductile "failure mode" requirement, Moechnig explained that the blueprint was referring to a "Frontal Impact test, which was intended to simulate a cyclist's front wheel colliding with an immobile obstruction."  (*Id.*

¶ 9.)  Lastly, concerning Martec's business duty, Moechnig claimed that Martec was indeed under a business duty by way of a particular contract.  (*Id.* ¶ 27.)

Seeking to exclude this affidavit from Moechnig, the Oliveros first object that submitting evidence with a summary judgment reply brief is simply not allowed.  (ECF No. 78 at 5–7.)  The undersigned enforces no such restriction.  To be sure, evidence attached to a reply brief rarely eliminates a dispute over a material fact.  But there is no blanket procedural exclusion of such evidence.

The Oliveros additionally object that Moechnig's statements are the sort that one would expect to be backed up by documentary evidence, yet Trek produced no such evidence during discovery.  (ECF No. 78 at 7–13.)  The Oliveros' insinuation is that Trek and/or Moechnig are simply making things up now, or that an egregious discovery violation took place.  Trek responds by affirming that it has produced all documents responsive to the Oliveros' discovery requests and all documents that it must produce under Rule 26.  (ECF No. 81 at 13.)  They further affirm that Moechnig's affidavit "is based on Mr. Moechnig's extensive personal knowledge and experience as the Trek engineer who personally designed and oversaw the production of the Fork on behalf of Trek."  (*Id.*)

The Court agrees with the Oliveros to the extent that the matters addressed in the Moechnig affidavit are the sort of thing one would normally expect leave a paper trail.  But it is not beyond belief that a paper trail never existed, or no longer exists.  Trek's attorneys have now represented as officers of the Court that they and their client have complied with discovery obligations.  In such circumstances, the Court has no basis to look behind counsel's representation.

Given this, the Court finds nothing objectionable about the Moechnig affidavit. It provides additional detail to rebut arguments raised by the Oliveros in their response briefs. It is therefore typical reply-brief evidence. As will become clear below, it does not "clinch" summary judgment for Trek, but it is nonetheless appropriately considered at summary judgment. The Oliveros' Motion to Strike Reply Evidence is denied.[4]

## IV. SUMMARY JUDGMENT ANALYSIS

Having cleared away all of the foregoing, the Court now turns to Trek's argument that it is entitled to summary judgment.

### A. Legal Standard

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the

---

[4] The Oliveros are free, of course, to cross-examine Moechnig regarding the lack of a paper trail, to the extent his direct testimony includes discussion of the issues addressed in his affidavit.

Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

**B.    "Without More" and the "Malfunction Doctrine"**

In Colorado, it is established that, "without more," the fact of damage or malfunction "does not establish that the product was defective or unreasonably dangerous."  Colo. Jury Instr., Civil 14:7 (4th ed., June 2017 update).  Trek's primary summary judgment argument is that the Oliveros' have failed to provide the "more" required to move from the fact of malfunction to the inference of a manufacturing defect.

1.    The Meaning of *Union Insurance*

Trek particularly attacks Kappius's expected testimony because his report rather baldly concludes that "all signs point toward spontaneous and catastrophic failure of the fork that can only be attributed to underlying defects."  (ECF No. 68-1 at 15.)  Trek argues that Kappius's "inability to identify the alleged defect in the Fork renders his opinion nothing more than conjecture and subjective belief, which is insufficient to survive a motion for summary judgment."  (ECF No. 33 at 15.)

The Oliveros respond with *Union Insurance Co. v. RCA Corp.*, 724 P.2d 80 (Colo. App. 1986).  The *Union Insurance* case arose from a house fire.  *Id.* at 81.  The plaintiff insured that residence, paid the insurance claim, and thereby became subrogee of the insured.  *Id.*  In that capacity, the plaintiff brought suit against the manufacturer of the insured's television set, claiming that "the fire was caused when the TV ignited because of defects in its design and/or manufacture."  *Id.* at 81–82.  The plaintiff lost at trial and then appealed.  *Id.* at 81.

The arguments on appeal largely focused on a particular jury instruction that the Colorado Court of Appeals held to be erroneous.  Neither those arguments nor the

Court of Appeals's holding are relevant to this case. *See id.* at 82. However, the

defendant put forth an alternative basis for affirming the verdict, namely, that the

erroneous jury instruction "was harmless error because plaintiff offered only

circumstantial evidence that the TV caused the fire, and, absent direct evidence of

cause and defect, defendant was entitled to a directed verdict." *Id.* The Court of

Appeals disagreed, noting "[e]xtensive and detailed testimony by experts in fire

investigation showed that the fire started in the specific location of the TV and identified

the area in the TV at which ignition occurred. This testimony also excluded other

possible causes of the fire." *Id.* at 83.

The defendant persisted however, "contend[ing] that evidence showing that the

TV ignited should not be sufficient to establish the inference that it was defective." *Id.*

The Court of Appeals again disagreed:

> [D]irect proof of defect was impossible in this case because
> the TV was destroyed in the fire. A ruling that proof of defect
> is unattainable as a matter of law in circumstances such as
> these would effectively establish a conclusory presumption
> of non-liability in favor of strict product liability defendants
> whose products self-destruct in the process of causing injury
> to persons or property. We are not prepared to adopt such a
> view. Therefore, we hold that plaintiff's evidence was
> sufficient as a matter of law to create an issue of fact as to
> the element of defect.

*Id.*

The Oliveros cite *Union Insurance* for the proposition that, "even in the absence

of direct evidence of cause and a specific defect, circumstantial evidence may provide

that further evidence [*i.e.*, the 'more' in 'without more'] and be sufficient to create an

inference of product defect." (ECF No. 49 at 30.) The Oliveros also note two Tenth

Circuit decisions that arguably interpret *Union Insurance* in this way. The first of those

cases is *Weir v. Federal Insurance Co.*, 811 F.2d 1387 (10th Cir. 1987), a case arising from a house fire allegedly caused by a defective clothes dryer. *Id.* at 1389. The defendant manufacturer argued, as the defendant did in *Union Insurance*, "that there is no evidence of how a particular defect in the dryer caused the fire and that, therefore, the district court erred in denying [the defendant's] motions for a directed verdict or a judgment n.o.v." *Id.* at 1392. The Tenth Circuit disagreed, quoting the same portion of *Union Insurance* block-quoted above. *Id.* It then stated that "[t]he inference of a defect is permissible whenever the plaintiff has introduced evidence that would exclude other causes of the accident." *Id.* The Tenth Circuit concluded that the plaintiff had introduced such evidence, and therefore rejected the defendant's argument. *Id.*

The second of the Oliveros' two Tenth Circuit cases is *Oja v. Howmedica, Inc.*, 111 F.3d 782 (10th Cir. 1997), which was a manufacturing defect lawsuit about a hip replacement implant. *Id.* at 784–85. The district court had granted the defendant's motion for directed verdict on any theory of manufacturing defect, leaving only a theory of design defect. *Id.* at 792. The Tenth Circuit's review of the district court's directed verdict contains the following analysis:

> Under Colorado law, a plaintiff may prove a manufacturing defect by direct or circumstantial evidence. [Citing *Union Insurance*.] In this case, the [key component of the artificial hip] was completely missing when Dr. Evans removed [the artificial] hip. Under such conditions, direct proof of a defect in the staking peg was impossible. [Citing *Union Insurance*.] Accordingly, Oja relied exclusively on circumstantial evidence to support her manufacturing defect claim.

*Id.* The Tenth Circuit then went on to note that the defendant manufacturer had received two reports of problems arguably similar to those experienced by the plaintiff, and that the defendant manufacturer had inspected the lot of implants from which the

plaintiff's hip had come and had rejected one of them based on a problem arguably similar to what could have caused the deterioration of the plaintiff's artificial hip. *Id.* at 792–93. The Tenth Circuit found that a jury could reasonably rely on this evidence to conclude that the plaintiff's artificial hip suffered from a manufacturing defect. *Id.* at 793.

The Oliveros claim that this general approach to product defect cases is known as the "malfunction doctrine" and has been embodied in the *Restatement (Third) of Torts: Product Liability* § 3 (1998) ("Restatement § 3"):

> It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, *without proof of a specific defect*, when the incident that harmed the plaintiff:
>
> (a) was of a kind that ordinarily occurs as a result of product defect; and
>
> (b) was not, in the particular case, solely the result of causes other than product defect existing at the time of sale or distribution.

(Emphasis added.) This Restatement section has never been explicitly adopted in Colorado, but the Oliveros argue that *Union Insurance* effectively establishes the same rule. (ECF No. 49 at 33–35.)

Trek replies that the rule of *Union Insurance* only applies if the accident destroys the object that allegedly caused it. (ECF No. 63 at 8–9.) Trek relies on the analysis of U.S. District Judge Phillip S. Figa (since deceased) in *Hauck v. Michelin North America, Inc.*, 343 F. Supp. 2d 976 (D. Colo. 2004). *Hauck* arose from an auto accident ultimately caused by a tire that suddenly shed its tread while the vehicle was traveling on the freeway. *Id.* at 978–79. The defendant filed a Rule 702 motion to exclude the plaintiff's expert's testimony regarding the cause of the tire failure. *Id.* at 978. Judge Figa granted the Rule 702 motion for various reasons, including that the expert's

opinions were not adequately supported by reliable technical or scientific reasoning. *Id.* at 980–86. Then, when evaluating the defendant's summary judgment motion, Judge Figa noted that exclusion of the plaintiff's expert meant the plaintiff had "no relevant evidence that the [tire in question] was defective at any time, or specifically that it failed due to a manufacturing defect, a matter that is beyond the ambit of common knowledge or experience of ordinary persons." *Id.* at 988.

The plaintiff persisted, however, citing *Union Insurance* and *Oja* (although apparently not *Weir*) for the proposition "that Colorado law allows for proof of product defect through circumstantial evidence." *Id.* Judge Figa rejected this argument, distinguishing *Union Insurance* and *Oja* as cases about products that destroyed themselves and therefore could not be examined:

> While it is correct that the *Union* and *Oja* opinions state that a plaintiff may prove a manufacturing defect by circumstantial evidence, it is apparent to this Court that those statements are based on the particular factual situation that existed in each case, and do not supply a rule for general application.
>
> In both *Union* and *Oja*, the alleged defective product was destroyed or was completely missing after the incident that gave rise to the claims of strict liability, and hence direct proof of a defect was impossible. Here, by contrast, the allegedly defective tire is not destroyed or missing. . . . Accordingly, the statements made in *Union* and *Oja* regarding the use of circumstantial evidence to support a manufacturing defect claim when the alleged defective product has been destroyed have no application here.

*Id.* (internal quotation marks and citations omitted). In addition, said Judge Figa, no "competent expert on tire design and tire manufacturing" had "ruled out" the possibility of conducting tests on the tire. *Id.* at 988–89.

Trek views *Union Insurance* as operating against a background rule that

manufacturing defects must be proven by direct evidence. Trek apparently finds this background rule in the requirement that malfunction or damage, without more, does not permit a finding of defect. In other words, for Trek, the general rule is that the "more" in "without more" must include observation and testing of the item in question to formulate a hypothesis about a certain manufacturing error that likely caused the malfunction. But, says Trek, *Union Insurance* created a narrow exception in cases where the allegedly defective item can no longer be examined. In those cases, "more" can exist by way of circumstantial evidence, including evidence that tends to exclude other causes (as in *Union Insurance* and *Weir*), or shows that a defect similar to the one allegedly at issue has been found in other specimens of the same product (as in *Oja*).

The Court doubts that this is the best reading of *Union Insurance*. In particular, the Court doubts whether the court in *Union Insurance* was reasoning against the background rule articulated by Trek (as opposed to a background rule that some form of evidence must exist beyond the fact of malfunction, be it direct or circumstantial evidence). But even if Trek has correctly divined the Colorado Court of Appeals's intent in *Union Insurance*, this Court would still need to address the Oliveros' argument that the Colorado Supreme Court *would* adopt the malfunction doctrine as stated in Restatement § 3, if presented with the question. (*See* ECF No. 49 at 4–5, 35.) That is because, at least for this Court, the Colorado Court of Appeals is not the final word on the subject. *See Clark v. State Farm Mut. Auto. Ins. Co.*, 319 F.3d 1234, 1240–41 (10th Cir. 2003) (federal courts sitting in diversity are not bound by the decisions of state intermediate appellate courts).

    2.    <u>What the Colorado Supreme Court Would Likely Decide</u>

The Court agrees with the Oliveros that the Colorado Supreme Court would likely

adopt Restatement § 3 (assuming its framework is not already a part of Colorado law). This is so for three major reasons.

*First*, Trek's position would almost always—and perhaps literally always—require a plaintiff in a manufacturing defect case to retain an expert to perform special analysis, testing, etc., on the remains of the damaged object. But historically the Colorado Supreme Court has rejected arguments that would make expert testimony a necessary part of the plaintiff's case. *See, e.g.*, *Am. Family Mut. Ins. Co. v. Allen*, 102 P.3d 333, 344 (Colo. 2004) ("If the reasonable investigation and denial of an insured's claim is within the common knowledge and experience of ordinary people, then expert testimony is not required."); *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 920 (Colo. 1997) ("expert testimony is not necessary to establish a prima facie case of trespass"); *Pomeranz v. McDonald's Corp.*, 843 P.2d 1378, 1384 n.7 (Colo. 1993) ("Expert testimony is not always required to establish the amount of future damages.").[5]

*Second*, and closely related to the foregoing, is that Trek essentially proposes a "best obtainable evidence rule," a proposition the Colorado Supreme Court looked upon unfavorably in *Pomeranz*, *supra*. Specifically at issue in *Pomeranz* were damages for future taxes and future maintenance expenses flowing from breach of a commercial lease. 843 P.2d at 1380–81. The plaintiffs' only testimony regarding these damages was through the landlord's "managing co-owner." *Id.* at 1380. The defendant argued that the co-owner had not been qualified as an expert and so his estimates of future

---

[5] The major exception, it seems, is professional negligence claims—although even in that context the Colorado Supreme Court has not spoken categorically. *See Redden v. SCI Colo. Funeral Servs., Inc.*, 38 P.3d 75, 81 (Colo. 2001) ("Expert testimony is generally necessary to assist the trier of fact in determining the applicable standards [of care in a professional negligence case] because in most cases such standards are not within the purview of ordinary persons.").

damages should have been excluded. *Id.* at 1382. The defendant drew this argument

from a previous Colorado Supreme Court decision where it had found a lay witness's

lost profits testimony admissible because it was a "reasonable basis for computation

and the best evidence obtainable under the circumstances of the case." *Tull v.*

*Gundersons, Inc.*, 709 P.2d 940, 945 (Colo. 1985) (internal quotation marks omitted).

The landlord's witness, the defendant argued, did not present the best evidence

obtainable under the circumstances because an expert could have testified regarding

mill levies, property valuations, and so forth. *Pomeranz*, 843 P.2d at 1382. The

Colorado Supreme Court disagreed, reasoning that *Tull* "did not establish a requirement

that plaintiffs must *always* submit the best obtainable evidence under the

circumstances." *Id.* at 1382–83 (emphasis in original). "Were such a requirement

always necessary, courts would be required to draw arbitrary lines on what is the best

evidence under the circumstances, or whether expert testimony is always necessary."

*Id.* at 1383 n.7.

This is fundamentally the same problem raised by Trek's interpretation of *Union*

*Insurance*. Trek seems to think that *Union Insurance* establishes an easy, binary

distinction: whether the allegedly defective item destroyed itself or not. In real life this

question cannot always be answered with a simple yes or no. Accidents of the type at

issue here are a good example. Consider a carbon fiber bicycle fork that, through some

sort of manufacturing error, conceals a few small air pockets in one particular location.

If the fork eventually snaps in that location, would the evidence of the air pockets'

existence still be detectable, or would the tearing of the carbon fibers (as visible in the

photographs submitted in this case) obliterate the evidence of their existence? What if

the accident happens as Bretting says it would, *i.e.*, the front wheel drifts forward and the large chain ring or a crank arm strikes the ground, followed by the upper fracture surface of the fork, potentially scraping away a few millimeters of the upper fracture surface as it grinds against the pavement? In these scenarios, the various pieces of the bicycle are still available for inspection, but it is not clear whether any expertly administered test could detect that air bubbles had once been present at the location of the fracture. Given these complications, courts operating under the rule of *Union Insurance* (as Trek articulates it) "would be required to draw arbitrary lines on what is the best evidence under the circumstances." *Pomeranz*, 843 P.2d at 1383 n.7.

*Third*, many states already accept that a plaintiff may pursue a manufacturing defect case solely on circumstantial evidence, without establishing a specific defect. *See* Restatement § 3, Reporter's Note to cmt. c (citing cases to this effect from, or applying the law of, Arizona, Arkansas, the District of Columbia, Florida, Hawaii, Idaho, Illinois, Michigan, Minnesota, Missouri, Nevada, Ohio, Oklahoma, Pennsylvania, and West Virginia). Trek has pointed to no jurisdiction that has rejected such a theory, nor can the Court envision a reason for the Colorado Supreme Court to do so. Again, the Colorado Supreme Court has not typically been doctrinaire about the way a plaintiff must go about proving the case-in-chief. Thus, the Court predicts that the Colorado Supreme Court would adopt Restatement § 3.

Trek seems to believe it is significant that the Oliveros did not even try to perform any special testing on the fork. (*See* ECF No. 63 at 8 ("Because Plaintiffs elected to forgo any analysis of the available physical evidence—including something as basic as measuring the Fork—they are not entitled to an evidentiary inference of defect."

(emphasis removed)).)  This seems like a fact to be elicited on cross-examination.  It is

not a fatal legal flaw in the Oliveros' case.  The basic problem against which Trek

struggles is the reality that a plaintiff may choose to go to trial on less-than-ideal

evidence, so long as the evidence is not so weak that no reasonable jury could find in

the plaintiff's favor.  That is the real question here, to which the Court turns next.

**C.      Sufficiency of the Oliveros' Evidence**

Again, Restatement § 3 permits a plaintiff to present a circumstantial

manufacturing defect case, "without proof of a specific defect," if the plaintiff can prove

that the harm-causing incident "(a) was of a kind that ordinarily occurs as a result of

product defect," and "(b) was not, in the particular case, solely the result of causes other

than product defect existing at the time of sale or distribution."  Trek challenges both

elements, and so the Court will discuss both in turn.

1.      <u>"Was of a Kind That Ordinarily Occurs as a Result of Product Defect"</u>

The Oliveros have presented sufficient evidence of this element through at least

the following.

First, "Trek has admitted that, absent a manufacturing defect, absent prior

damage, and absent an overloading event, this fork should not fail under normal riding

conditions."  (ECF No. 49 at 22, ¶ 36.)

Second, Trek's own literature regarding the fork at issue here states,

> In an accident or impact that does not break the carbon fiber,
> the carbon fiber could have internal or hidden damage but
> appear normal. . . .

* * *

> **WARNING: A carbon fiber part that has damage can
> break suddenly, causing serious injury or death.
> Carbon fiber can conceal damage from an impact or**

**crash. . . .**

(ECF No. 49-23.)  Although these statements refer to accidental damage, the principle that carbon fiber can conceal a flaw and then suddenly fail is certainly relevant here.

Third, Trek does not dispute the following characterization of Moechnig's deposition testimony:

> [t]here are a variety of potential failures in the manufacturing process for carbon fiber at Martec that are highly technical in nature and involve a lot of hand labor, such as the carbon fiber-to-resin ratio, a gap where there is no carbon fiber leaving a thin spot in the layer, the operator not following the production standards, using the incorrect size and angles of the sheets of carbon fiber in the lay-up, problems with bonding, "kitting", curing with a heated press . . . .

(ECF No. 49 at 23, ¶ 47.)

This evidence, if presented to a jury, would be enough for the jury to find the first element satisfied.  To be sure, Trek can present contrary evidence, such as its assertion that braking to a stop would likely place more pressure on the fork than the normal riding conditions that, according to the Oliveros, led to its failure.  But Trek's evidence is not so overwhelming that a reasonable jury would be forced to reject the Oliveros' case.

2.  <u>"Was Not, in the Particular Case, Solely the Result of Causes Other Than Product Defect Existing at the Time of Sale or Distribution"</u>

The Oliveros have presented sufficient evidence of this element through at least the following.  First, from the eyewitnesses' perspective, Olivero's bicycle simply collapsed underneath him—they saw no foreign object.  Second, post-accident investigation located nothing that might qualify as the foreign object necessary for Bretting's theory to be correct.

Trek argues that the Oliveros have nonetheless failed to plausibly rule out alternative causes.  (ECF No. 63 at 13–14.)  But the Oliveros need not definitively do

so—they only need evidence from which a reasonable jury could conclude it is more likely than not that the accident did not result solely from something other than a manufacturing defect. *Cf. Weir*, 811 F.2d at 1392 (applying *Union Insurance* and noting that "[e]vidence offered by the defendant that is contrary to the evidence offered by the plaintiff creates a question for the jury; it does not prevent the jury from relying upon the plaintiff's evidence and inferring a defect"). On the record presented here, the Oliveros have sufficient evidence from which a reasonable jury could conclude that no foreign object existed, while Trek has presented evidence from which a reasonable jury could conclude that a foreign object *did* exist. In such circumstances, summary judgment is inappropriate.

　　　　3.　　Result

　　To the extent the evidence at trial reflects what the Court has seen in the summary judgment record, the Oliveros would be entitled to a jury instruction consistent with Restatement § 3. Thus, the jury would be permitted to decide whether the two elements of Restatement § 3 have been satisfied, and if so, the jury would be permitted—although not required—to infer that a manufacturing defect of unknown nature caused the fork to fail. Trek's summary judgment motion will therefore be denied.

## V. TREK'S OBJECTION TO KAPPIUS'S RESPONSE AFFIDAVIT

　　Responding to Trek's argument that *Union Insurance* requires testing if the object remains available for inspection, the Oliveros submitted a supplemental affidavit from Kappius. There, Kappius attempted to explain why he had not performed any tests on the forks:

　　　　Knowledge of the actual manufacturing specifications,

including the specific fiber, epoxy types, and layup schedule, would be extremely important, if not essential, in any further analysis to determine if [the fork] was manufactured according to the manufacturing specifications and why the design specification was apparently not adhered to.

None-the-less, any further analysis that would be necessary to potentially uncover the common and well-known sources of carbon fiber catastrophic failures, such as porosity or voids in the carbon fiber, delamination of layers, or improper layup of the carbon fiber layers would require the development of a detailed and expensive protocol involving destructive testing of the carbon fiber fork, which testing should minimally include the following: dissection, optical and scanning electron microscopy, Fourier transform infrared spectroscopy, thermogravimetric analysis, dynamic mechanical analysis, and mechanical testing, and, because the Chinese manufacturer's specifications are unavailable, comparative analysis with an exemplar of another fork of the same make and model number.

However, given the nature of carbon fiber failure, and the fracture in this case, which can often obliterate the actual defect involved, any such testing would not necessarily be conclusive or determinative of the existence or non-existence of such a manufacturing defect, with the likelihood of revealing the source of the failure being substantially less than 100%.

I was never authorized or requested to perform such further testing and that is the reason why I cannot further identify the specific manufacturing defect(s) in this case.

(ECF No. 49-22 ¶¶ 11–14.)

Trek, in its summary judgment reply brief, objects to the admissibility of these statements as an untimely expert disclosure. (ECF No. 63 at 10 n.7.)[6] Under the circumstances, the Court agrees. Kappius's additional information is the sort of information that he should have disclosed in his original expert report, and his failure to

---

[6] Trek's objection in this manner is proper according to the undersigned's Revised Practice Standards. See WJM Revised Practice Standard III.B (requiring a separate motion to obtain relief, except in certain circumstances such as "objections to summary judgment evidence").

do so deprived Trek of an opportunity to rebut these claims (*e.g.*, to argue that these tests are not as complicated as they sound, that a simpler test could yield useful results, that testing would not necessarily be futile, etc.).  The Court will therefore give Trek the same choice it gave the Oliveros above: Trek must elect between exclusion or obtaining a rebuttal to these new opinions.  If Trek elects to obtain a rebuttal, the Court will set an appropriate deadline.

## VI.  TREK'S MOTION *IN LIMINE*

The Court now turns to the final pending motion, namely, Trek's Motion *in Limine* seeking to exclude certain evidence related to Michael Olivero's claim of ongoing cognitive difficulties.

### A.    Background

Olivero spent three days in the hospital following his bike accident and was treated by, among others, Philip Yarnell, M.D., a neurologist.  His diagnoses upon discharge included: subarachnoid hematoma, facial lacerations, traumatic brain injury, and intracranial hemorrhage.  (ECF No. 66 at 3.)  On July 9, 2015 (a little less than a month after the accident), Olivero returned to Dr. Yarnell, who wrote the following in his treatment note for that visit: "His personality has been normal, except for some frustration intolerance, and cognition, he has had some short-term memory issues, which his wife feels are improving, and some sequencing issues."  (ECF No. 66-5.)

Olivero filed this lawsuit on April 1, 2016.  On May 23, 2016, Olivero returned to Dr. Yarnell.  Dr. Yarnell's treatment note for that visit includes the following:

> This is a one-year intensive follow-up . . . .
>
> * * *
>
> His wife says the only noticeable change cognitively and

> personality wise may be a somewhat shortened frustration
> tolerance. . . .

* * *

> Michael is interested in getting a final evaluation as to the
> extent of his injuries.  We will obtain an MRI of the brain and
> an EEG and also we will get formal neuropsychological
> testing and be able to summarize the extent of his injuries.

(ECF No. 66-6 at 1–2.)  Regarding the neuropsychological testing, Dr. Yarnell referred

Olivero to George Rossie, PhD.[7]  (ECF No. 24 at 2.)

On June 2, 2016, U.S. Magistrate Judge Michael J. Watanabe entered the

Scheduling Order in this action.  (ECF No. 16.)  The Scheduling Order set November

18, 2016 as the deadline for expert witness disclosures.  (*Id.* at 7.)

In written discovery responses dated September 27, 2016, Olivero described his

injuries, in relevant part, as follows: "Head injury symptoms remain that include

persistent tiredness, sequencing and short-term memory difficulties, lack of

concentration, fatigue and in particular, difficulty with multitasking challenges.  Head

injuries appear permanent."  (ECF No. 47-1 at 2.)  But Olivero answered "[n]o further

treatment is advised at this time" to Trek's request that he "[i]dentify in detail each health

care provider who has advised that you may require future or additional treatment for

any injuries you attribute to the [accident]."  (*Id.* at 3.)

On the expert disclosure deadline (November 18, 2016), the Oliveros disclosed

five non-retained treating doctors as experts under Rule 26(a)(2)(C), all of whom would

testify "consistent with [their] records" about the injuries they diagnosed and the

services they provided in response.  (ECF No. 47-5 at 2–4.)  Among these non-retained

---

[7] The parties repeatedly spell Dr. Rossie's name as "Rossi," but his own report shows
that he spells his name "Rossie."  (*See* ECF No. 66-12.)

experts was Dr. Yarnell.  (*Id.* at 3–4.)  None of the summaries of the doctors' expected testimony included a statement about ongoing or permanent cognitive problems.

The Oliveros were deposed on December 21 and 22, 2016.  They testified at those depositions that Michael Olivero has consistently suffered a number of mental and emotional symptoms since the accident, such as depression, frustration, feelings of being overwhelmed, difficulty managing schedules, difficulty multitasking, forgetfulness, and a short temper.  (*See generally* ECF Nos. 47-2, 47-3, 66-7.)

This state of the evidence apparently left Trek unsure about whether and how the Oliveros intended to prove some sort of permanent cognitive impairment.  On the rebuttal expert deadline (January 6, 2017), Trek disclosed Ernest Nitka, M.D., a neurologist.  (ECF No. 47-6.)  Dr. Nitka opined, among other things, that "Mr. Olivero would need to submit to high-quality neuropsychometric testing in an effort to validate his complaints.  Additionally[,] without this neuropsychometric testing, we don't know whether or not there are remedial actions that would help him in his daily life [to] mitigate his complaints stemming from the accident."  (*Id.* at 5.)

The Oliveros claim that, "[c]onsistent with [Dr. Nitka's] recommendations, on January 23, 2017, an EEG and MRI were performed."  (ECF No. 66 at 4.)  Two days after those procedures, Dr. Rossie—the psychologist to whom Olivero had been referred the previous May—began neuropsychological testing that lasted through March 14, 2017.  (*Id.* at 4.)

On January 31, 2017, the Oliveros moved to amend the Scheduling Order "to allow Plaintiffs additional time to supplement their [expert] Disclosures."  (ECF No. 24 at 1.)  As grounds for such relief, the Oliveros explained as follows:

> Dr. Philip Yarnell saw [Michael] in the hospital and diagnosed him with cerebral contusions from this bike crash. Dr. Philip Yarnell was disclosed as a Non-Retained FRCP Rule 26(a)(2) Expert on November 16, 2016, but Dr. Yarnell has continued to treat Plaintiff Michael Olivero and should be able to supplement his opinions as more information is provided.  By way of example, Dr. Yarnell prescribed Plaintiff Michael Olivero to get more care including an MRI, EEG testing, and a neuropsychological evaluation from Dr. George Rossi[e] on May 23, 2016.  Documentation of this prescription and report was provided to Defense Counsel. However, the actual MRI and visit with Dr. Rossi[e] did not occur until January of 2017.  Plaintiff Michael Olivero is getting much needed treatment for his brain injury, as this type of injury is difficult to fully diagnose.  Plaintiff seeks until March 24, 2017 to file supplemental expert reports for Dr. Yarnell and Dr. Rossi[e] about their opinions regarding Plaintiff Michael Olivero['s] injuries, bills, diagnosis, and prognosis from the bike crash.

(*Id.* at 2.)

Trek opposed this motion.  (ECF No. 26.)  Trek emphasized that Michael Olivero had been referred by Dr. Yarnell in May 2016 for an MRI, EEG, and neuropsychological testing—many months before the November 2016 expert disclosure deadline.  (*Id.* ¶¶ 17, 22–23, 29–30.)  Trek also noted Olivero's deposition testimony claiming that he was still waiting for insurance approval of the MRI, and that he had made an appointment with Dr. Rossie soon after Dr. Yarnell's referral, but on the day of the appointment, he simply did not feel like going and so he canceled it.  (*Id.* ¶ 17.)  Trek accordingly argued that the Oliveros failed to meet the "excusable neglect" standard necessary for modifying a scheduling order deadline that has already passed.  (*Id.* ¶¶ 4–8, 33–38.)

While this motion was pending, Dr. Rossie issued a written report regarding the outcome of the neuropsychological testing.  (ECF No. 66-12.)  Dr. Rossie diagnosed some "deficits [that] are subtle but notable especially in the high-level tasks measured

by executive function tests." (*Id.* at 2.)  He also reported Angela Olivero's opinion that Michael "has problems with sequencing, memory for recent events and multitasking with a 'lower boiling point'.  She does not think things have changed over the past year." (*Id.*)  However, Dr. Rossie did not recommend "formal neuropsychological therapies." (*Id.*)

On April 5, 2017, Judge Watanabe denied the Oliveros' motion to modify the scheduling order.  (ECF No. 44.)  Judge Watanabe agreed with Trek that "Plaintiffs offer no reason, compelling or otherwise, why Plaintiff Michael Olivero failed to seek and obtain additional medical treatment, including the MRI and neuropsychological evaluation from Dr. Rossie, before [the expert disclosure] deadline." (*Id.* at 3.)  The Oliveros never filed a Rule 72(a) objection to this ruling.

On May 4, 2017, Michael Olivero visited Dr. Yarnell again for a "neurologic follow up." (ECF No. 66-15 act 1.)  Dr. Yarnell's treatment note for this visit shows that he reviewed Dr. Rossie's report, as well as reports of a recent EEG and MRI (apparently those conducted in January 2017). (*Id.*)  Dr. Yarnell diagnosed, among other things, "some post-traumatic encephalopathy symptoms." (*Id.* at 2.)  He did not specifically state what those symptoms were.

## B.    The Instant Motion

On April 27, 2017, Trek filed the motion *in limine* now under consideration, seeking to exclude "any evidence regarding Plaintiffs' alleged future damages related to Mr. Olivero's brain injury." (ECF No. 47 at 10.)  Trek's motion notes that the Oliveros had, through their Rule 26 disclosures, disclosed six lay witnesses (described as "friends, coworkers, and family") who intended "to testify regarding their observations of

Mr. Olivero before and after the accident." (*Id.* ¶¶ 4, 21.)[8]  Trek argues that the medical

causation question (whether Olivero's bike accident caused the cognitive symptoms of

which he now complains) and the permanence question (whether the symptoms can be

expected to last indefinitely) require expert testimony.  Thus, Trek says, lay testimony

from the Oliveros and their witnesses about Michael Olivero's changed behavior is not

enough.  Trek further argues that the treating physicians may testify as experts only with

respect to matters reflected in their treatment records, and cannot offer a long-term

prognosis if not already reflected in those records.  (*Id.* ¶¶ 4, 15–18, 21–23.)  *Cf. Davis

v. GEO Grp.*, 2012 WL 882405, at *2 (D. Colo. Mar. 15, 2012) ("when a [treating

physician] opines as to causation, prognosis, or future disability, the physician is going

beyond what he saw and did and why he did it and is giving an opinion formed because

there is a lawsuit," and must therefore submit a formal expert report).

The Oliveros respond that the lay testimony they plan to offer is enough under

Colorado case law to permit a jury to infer causation and permanence.  (ECF No. 66 at

7–10.)  They also point to *Tran v. Hilburn*, 948 P.2d 52, 55 (Colo. App. 1997), which

contains the following passage:

> Symptoms of mild closed-head injury include: (1) physical
> symptoms such as nausea, headaches, dizziness, fatigue,
> lethargy, and sensory loss; (2) cognitive deficits such as loss
> of attention, concentration, perception, and memory not
> otherwise explainable; and (3) behavioral changes such as
> increased irritability, quickness to anger, disinhibition, and
> mood swings not otherwise explainable.

Given this, they claim that Michael Olivero's symptoms are "known sequelae" of the sort

---

[8] The Final Pretrial Order, entered a few weeks after Trek filed its motion in limine, lists
eight friends, family members, and coworkers as may-call witnesses for the Oliveros "as to
damages."  (ECF No. 71 at 8–10.)

of brain injury he suffered during the bike crash. (ECF No. 66 at 2.) Moreover, they claim, "[t]he fact of head trauma is unquestioned, no alternative explanations for the continuing problems have been suggested, and they are consistent with sequelae of the initial injury. . . . In such a case, expert testimony is not required and permanency and continued future noneconomic damages may be inferred." *Id.* at 9–10.

## C. Analysis

Concerning permanent injury and future damages, Colorado case law is consistent with the observation this Court made above (Part IV.B.2), namely, it avoids holding that expert testimony is always required for some set of theories or claims. But it does not rule out the possibility that expert testimony may be required under the circumstances of the case.

Trek relies on two Colorado Supreme Court cases where a jury verdict was reversed and the case was remanded for new trial when the plaintiff was allowed to seek damages for permanent injury and future pain solely on the plaintiff's own testimony. The first of these cases is *Cookman v. Caldwell*, 170 P. 952 (Colo. 1918), where the plaintiff complained of a battery that injured her shoulder and back, leading to a persisting problem of arm swelling and back pain when trying to lift objects or do certain chores. *Id.* at 953. The Colorado Supreme Court held under the circumstances that such testimony was not enough:

> In the case at bar there was no evidence of a patent physical fact, such as the loss of a limb or any other physical impairment, that would by observation be apparent to the jury, and show that the plaintiff had received a permanent injury or would necessarily suffer pain for some period of time, or would be affected in health and strength in the future. The evidence did not show to a reasonable certainty that the plaintiff would endure pain and suffering in the future as a result of the assault and battery complained of. The

> testimony of the plaintiff was all concerning a latent injury
> which was not apparent, and would leave the jury to
> conjecture whether or not it would affect her future health
> and strength. *The facts narrated by plaintiff were not such*
> *that, as a matter of common knowledge, some future pain*
> *and suffering would be inevitable.*

*Id.* (emphasis added).

The second case cited by Trek is *Barter Machinery & Supply Co. v. Muchow*, 453 P.2d 804 (Colo. 1969). In this case, the plaintiff was knocked down by a watchdog but his "injuries were slight, and the evidence was that he suffered a bruise on his right buttock about four inches in diameter and two abrasions on his lower left thigh." *Id.* at 804. "He testified that he had continuous lower back pain, but there was no medical evidence connecting his complaints to the slight injury sustained when the dog knocked him to the ground." *Id.* "In fact, the medical testimony was that the back pains were consistent with an arthritic condition, unrelated to the incident, and attributable to plaintiff's advanced age." *Id.* The trial court therefore erred when it instructed the jury on permanent injury and future pain. *See id.* at 805 (citing *Cookman* in support).

The following year, the Colorado Supreme Court decided *CeBuzz, Inc. v. Sniderman*, 466 P.2d 457 (Colo. 1970), on which the Oliveros rely. The plaintiff in *CeBuzz* sued a grocery store when she was bitten on the hand "by a tarantula spider or similar spider-like insect" hidden in a bunch of bananas that she was waiting to purchase. *Id.* at 458. She won at trial, including an award for permanent disability and future pain and suffering, and the defendant appealed. *Id.* at 458, 461. The "main thrust" of the defendant's appeal from this portion of the damages award was "that medical testimony is indispensable to the establishment of permanent disability, future pain or suffering, or future medical expense." *Id.* at 461. The defendant cited *Barter*

*Machinery* for that proposition, but the Colorado Supreme Court distinguished it as a case about "slight injuries" and potentially competing medical causes (being knocked down vs. pre-existing arthritis). *Id.*

> In the instant case, the medical testimony and the plaintiff's testimony reveals continuous pain in the left arm which started when plaintiff was bitten. The pain and weakness in the left arm persisted for over three and a half years from the time of injury to the date of trial and during the trial. The evidence also revealed over 350 office calls to her doctor for medication and treatment of her arm, and several hospitalizations for tests, therapy and surgery in an effort to alleviate this condition, which persisted unabated at the time of trial.
>
> This evidence on behalf of the plaintiff warrants consideration by the jury on the question of damages arising from future pain, medical expenses, and permanent disability.

*Id.* The court therefore affirmed the verdict.

The Colorado Court of Appeals has since repeatedly relied on *CeBuzz* for the notion that a jury may infer permanent injury from long-standing symptoms that started with or surfaced after the original injury, and therefore expert medical testimony is not required when such lay evidence exists. *See Lawson v. Safeway, Inc.*, 878 P.2d 127, 130 (Colo. App. 1994); *Morgan v. Bd. of Water Works of Pueblo*, 837 P.2d 300, 304 (Colo. App. 1992); *Sours v. Goodrich*, 674 P.2d 995, 996 (Colo. App. 1983). In such circumstances, therefore, an instruction that a jury may infer permanent injury is appropriate, and it is left to the jury to decide whether to draw that inference. *See Lawson*, 878 P.2d at 130.

The Court agrees with the Oliveros that their evidence may be presented in this framework, without expert testimony. *CeBuzz* establishes that medical causation in Colorado is not quite the inquiry that Trek seems to think it is. A plaintiff is not required

to prove (via expert testimony or otherwise) that a certain injury is likely to lead to certain symptoms if: (1) the relationship between the injury and the symptoms is fairly direct;[9] and (2) those symptoms did not pre-date the injury. In addition, *CeBuzz* establishes that the factual question of permanence may be satisfied by evidence of uninterrupted symptoms for two to three years (or more).

The Oliveros satisfy all of these requirements. First, Michael Olivero indisputably suffered a traumatic brain injury as a result of the accident, and the connection between a serious head injury and later cognitive difficulties is sufficiently direct. Second, he is prepared to present evidence that his current symptoms did not predate the accident. Third, he is prepared to present evidence that those symptoms have persisted. Accordingly, the Oliveros may pursue this theory before a jury and Trek's Motion *in Limine* will be denied.[10]

All that said, a few issues remain in light of statements the Oliveros make in their response brief—statements which amount to an announcement that they intend to evade any restriction on their ability to produce more recently-generated evidence about Michael Olivero's condition. To begin, the Court will *not* permit the Oliveros to introduce evidence of the EEG, MRI, or neuropsychological testing performed in 2017. To permit

---

[9] This requirement is not discussed explicitly in the Colorado cases, but is certainly implicit. For example, the woman bitten on her left hand by the spider in *CeBuzz* experienced pain and weakness her left arm. But if she had instead complained of intestinal problems, or a sudden onset of arthritis in her ankles, it is much more likely she would have needed to present expert evidence on medical causation. This is essentially no different from the general rule that "lay testimony about medical causation [is permitted] in cases where causation is fairly obvious." *Llewellyn v. Ocwen Loan Servicing, LLC,* 2015 WL 2127892, at *3 (D. Colo. May 5, 2015).

[10] To be clear, the Court's ruling does not rely on the fact that *Tran*, *supra*, described the lingering effects of closed-head injuries. (*See* Part VI.B, above.) Simply because symptoms of a medical condition are described in case law does not mean that laypersons understand the condition or the symptoms.

that evidence to come in through any method (including as Rule 703 evidence with Dr. Yarnell on the stand, through cross-examination of Dr. Nitka, or otherwise) would undermine Judge Watanabe's order, to which the Oliveros never objected. This includes evidence of expenses incurred. Further, Dr. Yarnell will not be permitted to testify about Michael Olivero's May 2017 visit. Dr. Yarnell's treatment notes about that visit are too vague for Trek to be able to prepare adequately for such testimony.

Finally, with regard to the Oliveros' apparent trial strategy of putting on numerous witnesses to discuss Michael Olivero's personality before and after the accident, the Court will vigorously police the provisions against wasting time and needless cumulative evidence found in Rules 403 and 611(a). In particular, the Court will require an extremely persuasive reason to admit all eight of the witnesses currently designated in the Final Pretrial Order to testify on this topic. The Oliveros are strongly encouraged to present only those witnesses who can provide the most compelling and salient testimony.

## VII. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    Trek's Motion for Summary Judgment (ECF No. 33) is DENIED;

2.    Trek's Motion *in Limine* (ECF No. 47) is DENIED, but certain of the Oliveros' evidence is nonetheless excluded, as stated in Part VI, above;

3.    The Oliveros' Motion to Strike Rebuttal Expert (ECF No. 68) is DENIED except as to the third paragraph of Bretting's "Opinions" section. As to that paragraph, the Oliveros shall file a notice with the court no later than **November 27, 2017** stating whether they choose to have the Court exclude Bretting's opinions, or

whether they instead choose to disclose a rebuttal report as to those opinions;

4.  The Oliveros' Motion to Strike Reply Evidence (ECF No. 78) is DENIED;

5.  Trek shall file a notice with the court no later than **November 27, 2017** stating whether it chooses to have the Court exclude the opinions contained in paragraphs 11–14 of Kappius's supplemental affidavit (ECF No. 49-22), or whether it instead chooses to disclose a rebuttal report as to those opinions;

6.  This matter REMAINS SET for a Final Trial Preparation Conference on January 26, 2018, at 2:00 p.m., and a five-day jury trial beginning on February 12, 2018, all in Courtroom A801 of the Alfred J. Arraj United States Courthouse.

Dated this 16th day of November, 2017.

BY THE COURT:

William J. Martinez
United States District Judge